Good morning. May it please the court, I'm James Laughlin and I represent the appellant Daniel Osazuwa. With the court's permission, I'd like to reserve two minutes of my time for rebuttal. The issue presented in this case is whether the government violated Batson when it intentionally used a peremptory challenge to strike a juror because she was a lesbian. The threshold question is whether Batson extends to strikes based on sexual orientation. It does if classifications based on sexual orientation received heightened scrutiny under the Equal Protection Clause. The government now concedes that heightened scrutiny does apply to such classifications. Where does the government concede that? I believe in a supplemental brief. It was a little coy, but I believe that they were adopting a position much more clearly taken in the Holder letter and the Galinsky brief where they unequivocally stated heightened scrutiny does apply to sexual orientation. Are we free to accept that concession by the government? What's the state of the law in our circuit? Well, Your Honor, I think that any of the law that predates Lawrence can be reconsidered and rejected on that basis because starting from Bauer… In other cases at least, specifically considered Lawrence. I'm sorry? I think maybe we shouldn't waste time on this issue. Let's get to the merits of it. Would you like me to go to the merits of the Batson issue then or talk more about the equal protection issue? Well, I guess the one predecessor legal issue is are the two the same? That is, you asserted that if there's a heightened scrutiny, then Batson coverage follows. Yes. And the government says, with some justification perhaps, that you're reading necessary and sufficient. You have them kind of crossed up because the cases certainly say that it's necessary, but do they say that it's sufficient? The only cases that I could find on that issue, and I'm talking about cases that are post-JEB, cite JEB for the relevant proposition, which is JEB is grounded in the fact that heightened scrutiny applies to gender discrimination claims under the Equal Protection Clause, and the fact that the court expressly said that preemptories may still be used against groups that get rational basis review, coupled with the fact that just one month later, Justice Thomas reasonably interpreted that opinion to say there's no principled reason why Batson shouldn't then extend to anyone who gets heightened scrutiny under Equal Protection. Do you really think that, I mean, for example, what I was about to say, do you think the Supreme Court is likely to accept that across the board rule, given the fact that Batson, the whole preemptory challenge problem is obviously a harder one or a more nuanced one than the run of equal protection cases. In other words, it's one thing to say you can't discriminate against Italians, I mean, people who are of national origin, or against Catholics in deciding who can go to school, and it's another thing to say that you can't make, that you're creating more and more limits on preemptory challenges. Well, I do think that if the court looks at this the way it has looked at its prior case law, that is a way, that is a conclusion it should reach. And I think Your Honor... I'm not hearing you that well. I don't know if you can do something else. Could you speak up? Sure. I do think that if the court considers this issue in light of its prior authority, that is the conclusion that it should reach. Well, aren't there, for example, court of appeals cases saying that religion is not a Batson category? No. I cite to one where the court clearly said that it is covered by Batson. The government cited to one where the issue was somewhat left open, but even in that case they said, well, if somebody was left off of a jury because they were a Christian, a Jew, or a Muslim, that would probably be unconstitutional. But what's questionable is whether if you start striking jurors because of their religious outlook. So I think that even in those cases they were dealing with not something that was just focused purely on a class that receives heightened scrutiny under the Equal Protection Clause, but... But even there, if you said somebody couldn't come to the University of California, Berkeley, because they believe in the Trinity, that would be a problem. But on the other hand, if you said they couldn't be on the jury because of it, it's a less obvious problem. That may be true, but I think that's a line-drawing problem that I think has a particular... that is particularly associated with a religion problem, because when we're talking about extending Batson to sexual orientation or heightened scrutiny to sexual orientation, what we're talking about is a class of individuals, gays and lesbians and gay men, that are very similar to race and gender. To the extent that people hold prejudices against those groups and use those in making decisions, including decisions to strike them from juries, that's exactly the kind of thing that the Equal Protection Clause was meant to protect against. And I would point the court to the cases cited in the opening brief at pages 25 to 27, where the Supreme Court talks about the policy reasons why it came to the conclusions it did in first Batson and then in JEB, extending that to gender, and in other cases dealing with another context. And the language they use when they talk about why we do this, it's because it's demeaning to the juror who's struck on the basis of discrimination, it's unfair to the defendant who's being tried, and it demeans the entire judicial process. Those things are all equally evident here if a litigant, whether it's a criminal case or a civil case, is allowed to strike a juror simply because of his or her sexual orientation. Well, we won't hold you to the ten minutes, but I do think we ought to get to the facts of this case. Okay, applying the three-step Batson standard here, the first step is easy. It's moot because the district court required the government to give its reasons for the strike. Step two also isn't an issue because the government did state reasons that were not facially discriminatory as to lesbians. So basically the case comes down to step three, whether the totality of the circumstances established that those reasons were just a pretext for purposeful discrimination. And did the district court make a finding on step three? Her only finding was, I find that excuse, well, she rejected the first two excuses, single juror, juror with no prior jury experience, but said that the fact that she had Nigerian friends was, quote, legitimate, and therefore denied the Batson motion. I think under this court's decision in the United States v. Alanis, that was not the kind of meaningful evaluation of the Batson issue that's required, but I do think under, just as in that case, in this case, the court can still go on to the third point to figure out whether the evidence in the record establishes purposeful discrimination. Of course, if the court concludes that the court's final finding was valid, then that finding is reviewed for clear error and we end up pretty much in the same place. Are you making a separate claim based on the rationale given by the U.S. attorney that they were striking the juror because she had Nigerian friends and that that's racially discriminatory? No, no, I did not make that argument. Perhaps I was inartful in my opening brief and the government was misled by that. My point was, and I think it's a valid one, is that in the step three analysis, the court looks at the totality of the circumstances, and the goal, of course, is to determine the discriminatory intent of the prosecutor. Whereas here you have a prosecutor whose supposedly non-discriminatory purpose stinks of a different kind of discrimination, I think that is irrelevant to the entire calculus as the court considers things because if there's no valid reason for striking a person just because they have Nigerian friends, I think that provides more evidence that the prosecutor simultaneously had a discriminatory intent against lesbians. It wasn't the culture of people from Nigeria an issue in the first trial? Not really, certainly not the way the government says, and I think that what's important about that is when this court looks at that issue, it has to look at what the prosecutor at trial said. It doesn't matter that the new government counsel, even this court, can think up reasons about why that juror might… But didn't you, in fact, I don't know, were you the trial lawyer in the first trial? No, I wasn't. So you said this guy has a different way of interacting with people as part of his closing argument. Right. And then it was actually the defense counsel who proposed the question about Nigerians, wasn't it? That's true, but if the court actually looks at the questions, you will see that they're clearly designed for one purpose. The purpose is to make sure that the juror is not prejudiced against Nigerians because they want to protect his rights. Yeah, but if he can make sure they're not prejudiced against Nigerians, I suppose he can make sure they're not prejudiced in favor of Nigerians, too. Oh, that's certainly true. If the evidence came out that somebody is so pro-Nigerian, or as the government likes to say, pro-Nigerian sentiments, whatever those are, then that might be a valid reason. But that's not what the juror said here. She said, I have friends and I have positive… Let me ask you what the consequence is. If we thought that when the district court said, well, essentially it seems to have said there were two illegitimate reasons because you had a lot of people on the jury who were single and who had sat on juries before. But there was one legitimate reason, i.e., which I take to mean one facially neutral reason, one neutral reason. So I'm going to accept the preemptory challenge. Now, if we thought that that meant that he never even got to stage, he never actually made a decision about whether it was pretextual. He just made a decision about whether it was legitimate, facially valid. Well, then what do we do? In other words, if there was a decision to be made, perhaps, but it wasn't made. But, of course, it's not going to get redone now. The whole case has been tried. What do we do with that juncture? Do we do it ourselves? Is that what you're suggesting? I think you have exactly the situation. What's the authority for that? United States v. Atlantis, which presented pretty much the same… Is that what happened in Atlantis? After he said it's plausible, they then went on themselves to make that decision? Right. The last footnote in the case said, although we normally would send this back to the district court for fact-finding, we on the cold record here can determine that there was purposeful discrimination and, therefore, that isn't necessary. But it could. If we wanted to send it back for fact-finding, is there any precedent for doing that when you have a trial that has been tried, it's over? Send it back to the district court to retry the question of whether it was a biased jury? I don't know of any off the top of my head. I can think of some practical problems with that, which is it's going to be very difficult to do some solid fact-finding after the fact or… Well, we do that in habeas all the time and we have evidentiary hearings. But what I don't know is that we send it back to the same judge who already has finished the trial and ask him. I mean, it's not a very auspicious way to get a fair determination. I would agree with that, Your Honor, and I guess if that was an option the court was considering, remanding to a different judge would be a way to address that problem. Well, half the reason you give in these cases is the judge observed these people at the time. He formed an opinion of them based on those observations. He was familiar with the testimony and in what context it came up. It wouldn't have helped much to send that to another judge. Aren't you really asking us to reverse the conviction? Yes, I am. Not fact-finding after the fact. Right, right. I'd like the court to do what it did in Alanis, which I think is the correct approach, which is to recognize that the evidence in the record satisfies the defendant's burden to show purposeful discrimination and therefore there's no need for further proceedings on his behalf. Let me ask you this about the third step. When he rejected the first two reasons, it wasn't because the reasons themselves were unacceptable. It was because he looked into it and found the facts that he hadn't rejected other people in those circumstances. He looked behind the reason. That was his step three analysis, wasn't it? Apparently. Yeah. Well, you can't tell whether that's step three to say that it's not that there's anything wrong with that reason, but in this context, looking at the circumstances, it's not an acceptable reason. Right. I think it's a bit unclear because what the court said was something like, well, there are plenty of other single people with no prior jury experience on the panel, and I don't know whether at that point the judge was distinguishing between those that have already been accepted or those that were, you know, had not yet been chosen, so I'm not sure. But what you did say was, so I think, but as to the Nigerian, she's the only juror who had extremely favorable experience with Nigerians, extremely is maybe an exaggeration, but anyway. So I think that's a legitimate reason to excuse or write a preemptory challenge. That's step two. And I accept that as an explanation. Why isn't that step three? I think it could be. I think that if it passes the bar that was set in Alanis, it might barely pass it and you get to step three. There doesn't really seem to be much difference in my view of how the court gets there, because if the court finds a valid step three finding, it reviews for clear error that final determination. If it doesn't, if it does what it does in Alanis, it still looks at the cold record to determine whether it's so obvious that there was purposeless. But the difference might be that as Judge Reinhart said, there's a lot of verbiage out there about deferring to the district court who saw the people and so on and so on as to a decision they actually made. So if the judge actually made that decision, it might come out differently than if he didn't make the decision. Yes. Yes, I think that's true. But here, given what was said, you could certainly find that all three steps were satisfied and go on to figure out how you can apply the clear error standard to the final ruling. If it does that, I think that it should be clear to the court that there was clear error. As the court noted, the first thing the district court did, and she was correct about this, was to say that, well, I'm dismissing that single jurors and jurors with no prior experience because there's plenty of them on the panel. But what she didn't also say was the government never got up and said why single jurors or why jurors with no prior jury experience were at all undesirable for them. And even on appeal, the government hasn't proffered any reason why those weren't good jurors for the government. And that's because they're facially implausible reasons. And it's well settled by this court and the Supreme Court that where there are facially plausible reasons, that will give rise to an indication of purposeful discrimination, even if there are other potentially valid non-discriminatory reasons. I think it's presumption, which can be rebutted. True, but I think that what... But that's correct, that if there are obviously pretextual or improper reasons, that that gets you to the point where you don't just look at the third the way you would otherwise, but you look at it with the fact in mind that they've tried to get out based on other not acceptable reasons. But then where does that get you? What's your view on whether this was a meaningful examination? If there's a meaningful examination, does the judge have to explain the process on the record? What is it that you find erroneous, clearly erroneous about the judge's performance of step three? Well, with regard to the conclusion perhaps reached on step three, I think what's clearly erroneous is the ultimate finding that that was legitimate. With regard to the process itself, I think as Judge Berzon may have suggested, it's unclear whether the court, when it said, I find that to be legitimate, meaning I find that to be a valid step two excuse, meant that the court went no further, or whether the court said, I find it to be legitimate, meaning a legitimate non-discriminatory excuse. But I think that the proper approach... Well, the first two reasons were also legitimate out of context. Once they were in context, they weren't legitimate. I'm sorry, what? The single person, whatever... No prior jury experience. Well, I don't think that they were legitimate in any sense. Well, it depends what we mean by legitimate, right? I mean, it does suggest the way she used it, that she did get to step three as to them, because as Judge Reinhart says, if he had just said it's because they're single, then you'd have to see whether that was honest or not. So she was really saying, well, it's not honest, not that it isn't valid. Legitimate reason in the sense of being a neutral reason. Right, correct. But it has to be relevant and genuine, right? It has to be a relevant and genuine reason. Right, right. And I think that that's why those two facts were so easily dismissed by the district court, because they are facially implausible. What do we make of the fact that both the government attorney and the district court judge mischaracterized the statement by the juror at issue concerning Nigerians? What the juror said was, I have two close friends I have known for 20 years, a married couple, they were both born in Nigeria, and I've met their families, and my experience has always been positive. Then the government attorney says, juror number four indicated that she had some very close Nigerian friends, and it sounded, I was just concerned about her knowledge of them, and then the court makes the finding that she was the only juror who had extremely favorable experiences with Nigerians, and that's not really what she said. Correct, and I would add one more step on appeal. The government attorney can now say she has pro-Nigerian sentiment. Well, that's what the government's now saying. The government's wildly exaggerating the statement by the juror. Right, and I think, though, if the court looks at Ali versus Hickman, they have a point addressing this, which is one of the factors that can go into the step three analysis is if the prosecutor feels the need to kind of stretch and mischaracterize what the juror said in order to make their point that it's a valid excuse, that's a factor that can suggest pretext, and I think that's what we have here. In the end, though, I think we still bump up against our existing case law concerning the level of scrutiny. Well, then, may I address wit and try to convince you of that? Wit is the problem. I mean, I think we have that on the books, and it would, I mean, it would probably have to be the subject of a civis bonte and bond call. Unless, I mean. Wit certainly post Lawrence if you want to tell us why wit doesn't bind us. Yes, I think that wit doesn't bind you for several reasons. First of all, there is the fact that in that case, and in the supplemental brief I cited to the opening brief that was actually filed in that case, so you can see that the wit plaintiff there actually conceded, probably wrongly, she shouldn't have done this, but even though it was post Lawrence, she conceded that the pre-Lawrence case of Phillips controlled her more traditional equal protection case. The court knew about Lawrence. I mean, the court, however right or wrong the court was when it makes a decision, we're bound by it. If we were only bound by the decisions that were right, I agree with that, Your Honor, but I don't think that wit, that one paragraph is what we're talking about, so that's what the court has to interpret. And if you look at it, because the plaintiff, or the appellant in that case had abandoned or basically conceded the issue of the more traditional equal protection claim, the only one that she pursued in the Ninth Circuit was this claim that comparing sexually active homosexuals in this country with others, quote, equally objectionable like child molesters. That's such a bizarre and novel claim, I'm not surprised the court dismissed it summarily. What, the Abatson claim is sort of an amalgam. I mean, there's an equal protection component from the point of view of the juror, but there's also a due process-like component from the point of view of the defendant, right? I mean, the case law seems to understand that it's resting kind of on two feet at once. So I'm sort of wondering whether the due process part of wit might apply even if the equal protection one doesn't. Which says there is a heightened scrutiny. I'm sorry? Which says there is heightened scrutiny with regards to due process. Right. I don't have an answer to that off the top of my head. Well, maybe we'll give you a little bit of a chance again on the model. But you're now up to 14 minutes. Thank you. Good morning, Your Honors. May it please the court, Mark Yohalam on behalf of the United States. I want to start by just clarifying what the government's position is on wit because I realize that I think there's some confusion about that. But the government's position is that there is binding circuit law applying rational basis review, but that wit is wrong and is indefensible and rests under the equal protection clause. Correct. It's not under the substitute process clause. The government thinks that it's correct. No, but wit, didn't wit say there was heightened scrutiny under the substitute? Yes. Right. Yes, Your Honor. So what about my last question? I think it's an interesting question, but I don't think that it's correct that you can go beyond equal protection in the Batson context. I realize I'm taking you a little back. I mean, it plainly does go somewhat beyond. It may not be the same thing as in wit, but obviously from the defendant's point of view, and the cases are aware of this, there's a cross-section question, there's maybe a Fifth Amendment question. It's a different set of issues. Absolutely. The defendant does have rights that are being affected by it, but when you're looking at what kind of jurors can be struck, it makes sense to go beyond equal protection, and I'll give you one example for why, is that there are all sorts of classifications based on speech, or restrictions on speech that would be subject to strict scrutiny. For example, political affiliation, simply espousing a viewpoint, which clearly those are permissible bases for striking someone from a juror, but nevertheless would be subject to strict scrutiny under First Amendment and due process principles. So I don't think you can just say, because some conduct would be subject to heightened scrutiny, that means you can't strike a juror for that conduct. Now, I do think that if heightened scrutiny applied to sexual orientation, as it should, then I think there would be the option of extending Batson, but as you noted, Judge Berzon, I think that's the first step of the question. It doesn't resolve it. I want to actually focus, if I can, on the facts of this case, and why there was not clear error by the district court in finding that the prosecutor had not struck Juror J.T. for a discriminatory reason, or more precisely, finding that defendant had not carried his burden of establishing that that's why the prosecutor had exercised the strike. The reason why is that I think if the court can resolve this case on that factual basis, which it can, then under the Doctrine of Constitutional Avoidance, it just shouldn't go down the question, the route of deciding whether there's a way out from wit, and whether if there is a way out from wit, Batson should be extended. So on the factual issue, I want to start with this question of the step three analysis, and I think Judge Reinhart is exactly right that if you look at what the district court actually said, the only way to read it is that the district court says it engaged in comparative juror analysis with respect to the single juror and no prior jury service, and because as Judge Berzon noted, Judge Fisher gives these two, sort of, what are clearly two steps at the end. She says it's a legitimate reason, and I accept that as an explanation. So this is quite different from Olanis. In Olanis, what the district court said is that's a plausible reason, and that's enough. That is so clearly stopping at step two. Does the district court just misstate what the juror actually said? She said, and honestly, you do the same thing, and you're brief in it. It's really troubling. The district court said that she was the only juror who had extremely favorable experiences with Nigerians, and that's not what she said. She just said she knew two Nigerians, and she had positive experiences with them, and you're brief. You start talking about juror JT's which is really far from what was said. Right. What's a fair characterization of what was said here? Sure. I want to walk through all of the different characterizations and explain why each of them is fair. The first thing is what the juror says is not merely I know two Nigerians. She says for 20 years, I've been friends with two Nigerians, and I've gotten to know their families. Now, I think it is absolutely fair to describe people you've known for 20 years as close friends. I think she said close friends. She said close friends. The prosecutor says very close friends. That is not a mischaracterization. It's certainly not a mischaracterization like what happened in Hickman. In Hickman, the juror says my religion would not prevent me from sitting in judgment in this case. The prosecutor says the juror said her religion would prevent her from sitting in judgment in this case. That is just a 180 difference. Your brief really wasn't this characterization that she was answering the question whether she had any biases. That isn't what happened. The judge first said, does anybody have any biases? Apparently, nobody answered. Then he said, does anybody know anybody from Nigeria? Then she answered that question. I will get to that in one moment. I want to just walk through each of the steps. Then the judge describes it as extremely favorable experiences with Nigerians. I think there that is not a mischaracterization. The word extremely may be exaggeration. I think if you are friends with somebody for 20 years, it is probably a favorable experience. You don't keep them for 20 years if it is a bad relationship. She said that she had never had any bad experiences with them. I also think it is important to realize that what we have here, none of us, including Mr. Laughlin and myself and your honors, were in the courtroom. Judge Fisher was. When Judge Fisher is saying extremely positive experiences, she likely was informed by not just what the jurors said, but the manner in which the jurors said it. I think to sit here and say that is a mischaracterization, rather than to give Judge Fisher some credit and think that it could be a fair characterization of what she said and how she said it. Now I want to turn to what I think is concerning both Judge Wardlaw and Judge Berzon, which is what the reasoning for striking the juror would have been. One does not strike a juror simply for having friends. The underlying reason of saying I am concerned about her friendship with Nigerians and that that would affect her ability to judge this case, it is clear that what the prosecutor is articulating is a concern about pro-Nigerian bias and about knowledge of Nigerian practices. She also says that she is concerned about her knowledge of them. The government is articulating that in our brief. I am not trying to put words in Juror J.T.'s mouth. It is very rare that a juror will say I have pro-X bias, anti-Y bias. It is often based on inferences. This is not a four-cause challenge. This is a peremptory strike. And I think on this record it was... Just for the record, and I don't know that it matters, it just was an annoying thing to read. What the brief actually said was the question that whether she had strong positive or negative feelings about Nigerians that would affect her ability to be impartial. And that is not so. That is the question that was asked, actually, Your Honor. The question asked, it was a block question. There was no response until the end of the question. And the question begins with is there anything about the fact that the defendant was born on a different country? Did anyone have any feelings along those lines? Apparently nobody answers. And then she says, have you a relative or a close friend who had any experience with people? I read it, although I realize there are different ways to read it, that that entire question was posed in a block and that at the end of it answers were given, not that there was sort of a delay there. Usually there will be some indication like no hand showing when there's no response there. So I certainly apologize that the court thought I was mischaracterizing. I thought I was quite scrupulous to quote at length all of the questions and answers. The judge asked a series of questions and there was no answers until she asked a separate question which was have you a relative or a close friend had any experiences with people from Nigeria, positive or negative? Yes. Now this was not a question that the government suggested, right? It was not, Your Honor. It was a question the defendant suggested. Right, so can't you infer from the fact it wasn't a question that the government even needed to ask that it really didn't care about that issue? Absolutely not. I think that it's clear from the closing arguments in both cases that the defendant had put Nigerian culture into the case and that was part of their theory of defense was that the reason why the defendant reached out and put his arm around the prison guard which is not what happened but that was their theory of what had happened was as a Nigerian gesture of friendship not understanding American culture. But we do know, this case is unusual in that we know that for various reasons that the government lawyer was concerned about gay issues in this case with regard to the jury. Wasn't there a question asked directly about homosexuals to the jury? Not... I think the answer is yes although the question was basically whether anyone in the jury believes that heterosexual men are all biased against gay men. It was going to, part of the case, there were sort of two theories of the defense. One was this, the first half explaining why the defendant had approached the guard which was that at the point that the guard made contact with a gay man he was so embarrassed that he had to concoct a theory. So the government was aware of both of them. You're absolutely right that it is relevant that the government posed this question. I think Mr. Laughlin is right that it's relevant that the government put it... And plus, although I don't think the defendant has mentioned this, why would anybody strike somebody who was single? Absolutely not, Your Honor. First of all, the government, the prosecutor struck four jurors all of whom were single and had no jury experience. Now you may think that that's a sort of bizarre... So he didn't strike a lot of people who were single and had no jury experience. No, that's true. But I think it's not as if the government had gone about striking all married jurors and then gave a completely different answer to that. Yeah, it could, Your Honor. In answer to your question of why someone being single could be relevant, I personally, I'm an appellate lawyer, I'm not a trial lawyer. I think the peremptory system is a little bit odd. But people, I think, make judgments like is someone in a long-term relationship? Are they... Does that import a degree of stability and community attachment? All what I think peremptory challenges are going to is looking for a specific kind of mindset, whether someone has a high community involvement, whether someone's conservative, whether someone is a law and order type. But once you've already determined that really that couldn't be it because there were a lot of people who were single who weren't struck, isn't it a legitimate question to say, well, what did he mean? No, I don't think so. First of all, I actually, in my district court, said these are pretextual reasons. And I think that it's also the case that where a prosecutor gives several reasons, if you look at the Lewis case from this court, there's several reasons, some of which you can find other jurors share. That doesn't mean that the strike is pretextual because it's often a combination of factors. So the fact that some jurors shared some of the factors is pretextual. None of the jurors shared all of the factors. None of the jurors... He was the only one who volunteered that she had an ex-domestic partner. That's true. That was the only distinction of her from the, I mean, she was... That's not the only distinction, Your Honor. She also said that she had two close Nigerian friends who came to see the prosecutor's demeanor, to see Juror JT's demeanor, found that explanation credible. That's reviewed for clear error. And I understand Judge Berzon described this as verbiage about that. It's not, with respect, Your Honor, it's not... No, I didn't mean that pejoratively. But I do have a question, which is what is the government's ultimate position about, I mean, suppose we were to go unbanked on the wet issue. If we were resolved that as a general equal protection matter, as the government now has been arguing, there is heightened protection with regard to sexual orientation, then what with regard to Batson in general? You don't want to answer that question. I can see you're smiling. I'm going to frustrate you, Your Honor, because the government's ultimate position is that it takes no position on that. That is not because we haven't thought about it. I assure Your Honor that... I'm sure a lot of thought went into taking no position. That is correct. Obviously, if this court took the case unbanked, I think it would be a wonderful result for heightened protection. It would take a position for one thing. Probably. I think our position throughout is going to be that the facts here just do not support a finding that it was clearly erroneous for the district... That's true. We'll get to that. If it's unbanked, you'll be asked the question. I understand that. I assume by then you'll have an answer. Let's get to the issue that we can decide this on, you hope, where we won't get to it. What do you think about the court's performance at Step 3? Did she adequately do what was necessary to meet her obligations under Step 3, and how do we tell that? Yes, Your Honor, she did. I don't think that Step 3 requires an extremely elaborate explanation. What happened in Alanis was a complete abdication of doing anything at Step 3. But we set forth some kind of rule, which I might say is verbiage. You have to do a meaningful examination or the next time we said something different but it comes to the same thing. There has to be a real analysis examination and then make a judgment. What does the judge have to do to show that she did that? I think very, very little. I think it's necessary for the judge to make a finding that shows that she did reach Step 3. But beyond that, I don't think that a judge needs to make a much more expansive record, especially whereas here defendant doesn't challenge the reasons as pretextual. Now, I think Mr. Locken is exactly right that Alanis says that the judge always has That was another part of your brief that seemed to me to be very questionable, especially given Alanis. He brought up that as a challenge and that's a challenge to the fact that this was the reason and this is a method of determining whether that's the case, but he raised the issue and that's the end of that. You know, I disagree, Your Honor, although I admit Don't we have a case specifically on point? From this circuit, the closest I can give you is Contreras-Contreras. But Mr. Locken is right that in Contreras-Contreras there wasn't any Batson objection. I thought Alanis said specifically that there wasn't any Batson objection. So Alanis says that you don't have to make an additional objection for the judge to reach step three. But let me explain why the lack of objection is still relevant. Maybe I can persuade you, probably not. But that's because I think we are used to thinking of Batson challenges strategically, not as two things. The first thing is the prosecutor struck a juror who the defense attorney thought was gay and worried that the prosecutor was striking her for being gay. He then asks the prosecutor to give an explanation. The prosecutor gives an explanation. He says I'm bringing a Batson challenge. He struck her because she was gay. I would like to hear the prosecutor's explanation. He actually says those words. I can point you to the page in the record. He says both. It's a much longer statement. He asks for Batson process to begin. He said I'm going to make a motion under Batson with respect to the prosecution's challenge. There was nothing more than fair and impartial. That's true. The only information that came out was that she had a domestic partner. In this case there is the issue with respect to homosexuality. I would move under Batson under the category of sexual orientation. He asked for the explanation. The only    that she had a domestic partner. I don't see where the court made a finding as to whether it was pretextual or not. Or whether it was purposeful discrimination. I think that is when the court says it's a legitimate reason and I accept it as opposed to two reasons to which she clearly applied comparative juror analysis. As Judge Reinhart notes, that is a step three. But as to your point that you have to separately object to the pretext, if you read Batson itself and the later cases, step three. The procedural steps are first of all the challenge and the second is the explanation. It's the judge who is step three, i.e., to make a decision as to whether it was discriminatory or not discriminatory. There is no separate evidentiary step at step three. I think certainly under Olanis there is no requirement . Again, I would note that several circuits, not just the fifth and fourth circuits, but the second circuit, have held that a lack of an objection even after making the initial Batson objection, a lack of an objection. The defendant must persuade the district court that the government's nondiscriminatory reason is pretextual at step three. That's in the Collins case at page 920. Whereas here there is nothing that the defendant does to persuade the   district court. I absolutely agree that the objection at step one under Olanis requires the court to go all the way to step three. But I think that saying that the court has to go to step three is different from excusing the defendant for not offering reasons for why the prosecutor's explanation is pretextual. I can give you an example of where that would play out outside the Batson context. In terms of procedural errors at sentencing, there are obligations on the district court for what it has to do. I think we ought to look at that. I don't think it's practical to expect a judge to make the kind of record that you would  a pretrial motion. How do you know whether he engaged in a meaningful analysis? I mean, I don't know. I read that language to basically mean that a judge can't just say it's plausible, therefore I accept it. He says it's not plausible, he says it's legitimate. He compares it to other explanations which she says don't bear out under comparative jury analysis. I'm not asking the court to create a general principle about what is or isn't sufficient at step three. I just think on this record it's clear that Judge Fisher was not asleep at the wheel. She was doing step three comparative jury analysis. This court said that gives you a presumption and you have to at least make a far more careful examination than if you hadn't given an illegitimate reason to start with. I think they weren't illegitimate reasons. Again, I would point to the Lewis case which was the one where the prosecutor gave several explanations, two of which applied to other jurors beyond the one who was stricken, who were impaneled, and this court said that's not a problem as long as the combination of factors is unique to that juror. I think what I would read Judge Fisher as saying is look, those two explanations standing on their own wouldn't be enough. However, there is this third thing that distinguishes Juror JT and therefore I'm going to accept your reasons. I would also say this is not the sort of prototypical case where a prosecutor gives bad explanations and attains bad conclusions. It's where the prosecutor says I struck him because he's single. The judge says there are other single jurors. I meant I struck him because he had no jurors. The prosecutor keeps giving reasons until he finds one that sticks. Here what the prosecutor did is she started with there's this concern I have about his close Nigerian friends and her knowledge of them. There's that. Oh, and by the way, also she's single and had no prior jurors. I'm just wondering why the judge wouldn't have asked the juror whether she could be impartial in this case even though she had Nigerian friends. Because this is a perimetry challenge, not a for-cause challenge. Even if a juror says she can be impartial, you're allowed to strike her perimtorally. As I say, I'm not wild about the perimetry challenge system, but all the time you strike jurors for things where they haven't said I can't be impartial. You strike people for disability status. It is what it is. I think the whole process certainly would be distasteful if applied in an employment context, as Judge Berzon notes. Perimetry challenges are just different. We allow all sorts of capricious as Justice O'Connor said, reasons for striking people. Here, saying that she had close Nigerian friends and I'm concerned about her knowledge of them isn't nearly so capricious as I'm striking them for being disabled, for being old, for being a veteran, or any number of other reasons why people are  able to testify. This was a Nigerian cultural practice. In the second trial, unlike in the first trial, he had not put defendant on to testify. You would have had the possibility that a juror who had extrinsic knowledge might have brought that knowledge to bear to the defendant's benefit. I think it was plausible that the defendant wouldn't testify in this trial because he had perjured himself. I guess the last thing I would note is that one of the things Mr. Laughlin says is that we shouldn't put much stock in the striking of juror F who was the other juror whose uncle had gone to the peace court in Nigeria. The Boyd versus Newland case and Wade versus Terhune case say that you look at the whole transcript and that it's relevant, I do think the court would put less stock in strikes because Mr. Laughlin is correct. There's no evidence that's what happened here. All that's here is a credibility determination the prosecutors favor. No evidence as to whether there are other gay or lesbian jurors seated. A prosecutor who the explanation she gave bore out, she struck four jurors, all were single, all had no prior jury experience, two had I won't call it pro-Nigerian bias, but had favorable experiences either first or second hand with Nigerians. So I think on that record whether you're engaging in this sort of third step which is inappropriate here or clear error which would be appropriate here, there's no way that you can say that the district court clearly erred in finding that the defendant didn't bear his burden of establishing that the prosecutor strike was pretextual. Thank you your honors. I just want to respond to one thing in that regard to the Nigerian culture. I just want to address the government's arguments regarding the Nigerian culture defense. The government presents an excerpt from the closing argument of the first trial and I think it's worth looking at that closely because the court will see that there was a line about Mr. Osizua being from Nigeria and maybe touching the guard for that reason. But when read in context, that's not the defense. The defense is that the guard lied about what happened because through a mistake he ended up on the floor of the court. I think we take that closing argument and compare it to pages 50 and 51 of the excerpt which is the trial memo. Clearly the prosecutor had this when she wrote it because she quoted the portions before the mention of Nigeria and after the mention of Nigeria because she wanted to make the point that this case is about homosexuality. No place does she mention that Nigeria or Nigerian culture is at issue. Similarly when we get to Bourdier. She asked a Bourdier question about whether people think that all heterosexual men
judges: Reinhardt, Wardlaw, Berzon